*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TIMOTHY MALOY RIDDLE,

        Defendant-Appellant.

UNPUBLISHED
July 25, 2024

Nos. 363403; 367187
Barry Circuit Court
LC No. 2021-000789-FC

Before: GADOLA, C.J., and K. F. KELLY and MARIANI, JJ.

PER CURIAM.

In Docket No. 363403, defendant, Timothy Riddle, appeals by right his convictions after a bench trial of armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant also challenges his sentence of 570 to 900 months in prison for the armed robbery conviction.

In Docket No. 367187, defendant appeals by leave granted his sentences for his convictions of intentional discharge of a firearm in a building, MCL 750.234b(2); felon in possession of a firearm, MCL 750.224f; felon in possession of ammunition, MCL 750.224f; and malicious destruction of a building, MCL 750.380(3). After defendant pleaded guilty to these offenses, the trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 570 to 900 months in prison for each of these convictions.

In Docket No. 363403, we vacate defendant's convictions for armed robbery and felony-firearm related to the armed robbery charge, as well as his sentences for those offenses. In Docket No. 367187, we vacate defendant's sentences of 570 to 900 months in prison for the intentional discharge of a firearm in a building conviction, for each of the felon-in-possession convictions, and for the malicious destruction of a building conviction, and remand for resentencing for those convictions.

## I. FACTS

In May 2021, Matthew Weeks permitted defendant and defendant's girlfriend, Janelle Sottillie, to live in a motorhome on Weeks' property in Barry County, Michigan. Weeks testified

-1-

that two months later, he evicted defendant and Sottillie because he suspected defendant was using illegal drugs. Sottillie testified that she ended the relationship with defendant on August 4, 2021. Later that day, defendant broke into Weeks' home and stole two shotguns.

Weeks reported the theft of the guns to the Barry County Sherriff's Department and identified defendant as a potential suspect. Shortly thereafter, Officer Leonel Rangel of the Hastings Police Department saw defendant sitting in a vehicle at a gas station in Hastings. Officer Rangel asked defendant to step out of the car and informed him that the police wanted to question him about the home invasion.

Defendant instead sped away in his car. As Officer Rangel pursued defendant, he saw the barrel of a long gun protrude from the driver's side window of defendant's car. Deputy Isaac Yonkers of the Barry County Sheriff's Department joined in the pursuit of defendant, and testified that he also saw a gun protruding from defendant's car window. The chase reached speeds of over 100 miles per hour. Sergeant Scott Ware of the Barry County Sheriff's Department also joined the pursuit of defendant. Eventually, defendant stopped at a gas station in Woodland, got out of his vehicle, and pointed his shotgun at Sergeant Ware's patrol vehicle. Sergeant Ware responded by shooting at defendant several times. Defendant then ran inside the gas station's convenience store.

Taylor Utterback, an employee working at the gas station, testified that shortly before 7:00 p.m. she heard sirens in the distance and then heard gunshots. She went into the back room of the gas station where her coworker, Mary Avery, was working, locked the door, hid beneath a desk, and called 911 on her cell phone. Avery testified that while working in the back room, she heard sirens and several gunshots, and saw something flash through the front door. She testified that Utterback ran into the back room, slammed the door, locked it, and said, "Gunman, hide."

Avery testified that she heard defendant tell everyone to get out and then heard people running. She testified that she then heard defendant talking on the store's telephone, apparently to his girlfriend. Sottillie testified that defendant called her from the store and told her that he had intended to kill himself, but that when the police officer approached him he decided "to kill himself by cop." Avery testified that she heard defendant tell Sottillie that he had been shot multiple times by the police, that it was her fault, and that he wished he had killed her. Avery testified that she and Utterback hid for several minutes; during that time, she heard defendant throwing and breaking things in the store, which was very frightening. Utterback testified that she heard defendant say that he had a shotgun and that she was "terrified."

Avery testified that defendant eventually approached the door to the back room, and stated: "Is there anybody in there? Open the door. If you don't I'll shoot it down." Defendant then pounded on the door to the back room. Utterback testified that defendant said, "If there's anyone in there, I'm going to let you leave, I don't wanna involve anybody else; but if there's no one in there then I'm gonna shoot down the door." Avery opened the door; she testified that defendant was holding the store phone and said, "I don't want to hurt anybody so just go out the front door and get outta here."

Utterback testified that as she walked out, defendant told her to give him her cell phone, and she gave it to him. She testified that defendant told her that he would not ruin the cell phone

and that he only wanted to use it to call 911. In the 911 call recording,[1] defendant can be heard saying to Utterback: "I won't ruin your cellphone . . . . I just need to use it." Utterback testified that she never saw defendant with a gun,[2] but she believed that he had a gun based on his earlier statements and the gunshots she had heard. She testified that she felt she had no choice but to give him her cell phone. After taking Utterback's cell phone, defendant spoke with the 911 responder and can be heard on the recording saying, "I got a girl's cellphone, she gave me her cellphone, well she didn't give it to me but I took it, I just told her I wouldn't hurt it."

Sottillie testified that she and defendant talked on the phone for approximately one to two hours while he was in the gas station. Sottillie testified that while she talked with defendant, he also began speaking on another phone with a police negotiator. She testified that throughout their conversation, defendant was emotional, crying and yelling in anger.

At approximately 1:35 a.m. on August 5, 2021, defendant left the building, surrendered to police, and was taken into custody. Video from the gas station's surveillance cameras shows defendant talking on Utterback's cell phone as he leaves the building and surrenders to police in the parking lot; in the video, defendant lays the cell phone on the ground in the parking lot immediately before police handcuff him. Police retrieved Utterback's cell phone from the parking lot at the location where defendant was taken into custody. Utterback testified that police returned the phone to her about one and a half weeks after the incident.

Defendant pleaded guilty to all charges related to the home invasion, and does not challenge those convictions on appeal. With regard to the police chase, defendant pleaded guilty to fourth-degree fleeing and eluding, MCL 257.602a(2). With regard to the standoff at the gas station, defendant pleaded guilty to intentional discharge of a firearm in a building, MCL 750.234b(2); felon in possession of a firearm, MCL 750.224f; felon in possession of ammunition, MCL 750.224f; malicious destruction of a building, MCL 750.380(3); tampering with an electronic monitoring device, MCL 771.3f; and four counts of felony-firearm, MCL 750.227b. Defendant was then convicted after a bench trial of armed robbery, MCL 750.529; assault and battery, MCL 750.81; two counts of assault with a dangerous weapon (felonious assault), MCL 750.82; and two additional counts of felony-firearm, MCL 750.227b.

The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 570 to 900 months in prison for the armed robbery conviction, 120 to 180 months in prison for each of the felonious assault convictions, 93 days' incarceration for the assault and battery conviction, and 24 months in prison for each felony-firearm conviction. The trial court also sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 570 to 900 months in prison for the intentional discharge of a firearm in a building conviction, for each of the felon-in-possession convictions, and for the malicious destruction of a building conviction. The trial court sentenced defendant to 120 to 180 months in prison for the tampering with an electronic

---

[1] Utterback's cell phone was still connected with the 911 responder.

[2] Video from the surveillance cameras clearly shows defendant carrying a long gun with a shoulder strap at the time he directs Utterback and Avery to leave the store and takes Utterback's cell phone.

monitoring device conviction and to consecutive sentences of 24 months in prison for each felony-firearm conviction. The trial court denied defendant's motion to correct his sentence.

Defendant now appeals,[3] challenging his conviction and sentence for armed robbery, his conviction for felony-firearm related to the armed robbery charge, and his sentences for intentional discharge of a firearm in a building, felon in possession of a firearm, felon in possession of ammunition, and malicious destruction of a building.

## II. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

In Docket No. 363430, defendant contends that there was insufficient evidence presented at trial to support his conviction for armed robbery. He argues that the prosecution did not prove beyond a reasonable doubt that he used force or violence during the incident or that he intended to permanently deprive Utterback of her cell phone. We agree that the evidence was insufficient to prove armed robbery.

We review de novo a challenge to the sufficiency of the evidence. *People v Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). In doing so, we view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *Id*. We defer to the trier of fact's determinations regarding the weight of the evidence and the credibility of the witnesses. *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014). We review the trial court's factual findings for clear error, which occurs when this Court is definitely and firmly convinced that the trial court made a mistake. *People v Anderson*, 341 Mich App 272, 277; 989 NW2d 832 (2022). We review de novo the interpretation and application of statutes. *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017).

To support a criminal conviction, the prosecutor must introduce evidence sufficient to justify a rational trier of fact finding guilt beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992). Due process requires the prosecution to prove each element of the crime beyond a reasonable doubt. *People v Oros*, 502 Mich 229, 239 n 3; 917 NW2d 559 (2018). Circumstantial evidence and the reasonable inferences arising from the evidence may constitute evidence sufficient to demonstrate the elements of the offense. *Id*. at 239. However, circumstantial evidence "must facilitate reasonable inferences of causation, and not mere speculation." *Wang*, 505 Mich at 251 (quotation marks and citation omitted).

When a trial court conducts a bench trial, the trial court is required to "state its findings and conclusions on the record or in a written opinion made a part of the record." MCR 6.403; *Wang*, 505 Mich at 250. The trial court is not required to make specific findings on each element of the crime as long as the trial court correctly applies the law and sufficiently articulates its

---

[3] This Court consolidated defendant's appeals. *People v Riddle*, unpublished order of the Court of Appeals, entered September 15, 2023 (Docket No. 367187).

findings in accordance with MCR 2.517 and MCR 6.403. *People v Parkinson*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362683); slip op at 4.

In this case, the trial court found that the prosecution established that defendant engaged in armed robbery when he took Utterback's cell phone. The trial court stated:

> I do find the defendant guilty of [armed robbery and felony-firearm]. He clearly put her in fear. She knew he had a gun when she came running into the store, she said there's an armed gunman. She knew he had a gun. Clearly, she was in fear, and he put her in fear. He took the phone from her. Listen, I don't care what words you use, she felt like she had no option whatsoever. . . . She's scared to death. . . . She'd have given him anything if – if he asked. He's got a gun. Of course there was no option here. . . .
>
> And again, it's not that, well he just was gonna borrow the phone and eventually give it back. That's like if I go in a bank, and I tell the tellers, listen, give me all your money, I need it to pay my rent, I'm gonna give it back. And then when you're arrested they take the money back, and you still have the money. That doesn't change the fact, the fact that the gun was there. I mean, she felt like it was the . . . this phone's gone, I'm never gonna get this phone back. So I clearly find him guilty beyond a reasonable doubt of Count 3 and the accompanying firearm charge in Count 4.

Armed robbery is defined by MCL 750.529(1) as follows:

> (1) A person who engages in conduct proscribed under section 530 [MCL 750.530] and who in the course of engaging in that conduct does any of the following is guilty of armed robbery:
>
> (a) Possesses a dangerous weapon.
>
> (b) Possesses an article used or fashioned in a manner that would cause a reasonable person to believe the article is a dangerous weapon.
>
> (c) Represents orally or otherwise that he or she possesses a dangerous weapon.

MCL 750.530 provides:

> (1) A person who, in the course of committing a larceny of any money or other property that may be the subject of larceny, uses force or violence against any person who is present, or who assaults or puts the person in fear, is guilty of a felony punishable by imprisonment for not more than 15 years.
>
> (2) As used in this section, "in the course of committing a larceny" includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property.

Larceny is the "unlawful taking of the personal property of another with the felonious intent to deprive the owner of it." *People v March*, 499 Mich 389, 401; 886 NW2d 396 (2016) (quotation marks and citation omitted). The elements of larceny are (1) a trespassory taking and the carrying away (2) of the personal property of another (3) with the intent to steal that property. *Id*. Armed robbery is thus a specific intent crime that requires the prosecution to prove that the defendant intended to steal, or in other words, to "permanently deprive" the person of the property. *People v Parker*, 230 Mich App 337, 344; 584 NW2d 336 (1998).

While a general intent crime requires only the intent to do the physical act, a specific intent crime requires a criminal intent beyond the act done. *People Smith*, 336 Mich App 297, 303-304; 970 NW2d 450 (2021). The intent element of larceny to "permanently deprive" the owner of the property means that a defendant intends to retain the property "without the purpose to return it within a reasonable time" or "the retention of property with the intent to return the property on the condition that the owner pay some compensation for its return." *People v Harverson*, 291 Mich App 171, 178; 804 NW2d 757 (2010). A defendant's intent may be inferred from the facts and circumstances, including the defendant's actions. *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). Because intent may be difficult to prove, only minimal circumstantial evidence is necessary to show a defendant entertained the requisite intent. *Smith*, 336 Mich App at 308.

To summarize, to prove that defendant committed armed robbery when he took Utterback's cell phone, the prosecution was required to prove that defendant committed larceny (a trespassory taking and carrying away of the personal property of another with the intent to steal that property, i.e., permanently deprive Utterback of the cell phone), and that in the course of committing the larceny defendant used force or violence against any person present, or assaulted or put the person in fear, and also possessed a dangerous weapon or represented that he possessed a dangerous weapon.

The evidence demonstrates that defendant took Utterback's cell phone and "carried it away" by telling Utterback to give him the cell phone and then directing her to leave the building without her phone. Utterback testified that she believed that she had no option except to comply with defendant's demand, and the circumstances support her belief. Utterback had good reason to believe that defendant had a gun; she heard gunshots and, upon discovering the locked back room door, defendant threatened to shoot down the door. Although Utterback testified that she did not see defendant with a gun, defendant does not dispute that he had a gun, and video from the gas station's surveillance camera clearly shows defendant carrying a long gun with a shoulder strap at the time Utterback gives him her cell phone.

Defendant contends that the prosecution failed to demonstrate that he used force or violence to obtain the cell phone. The statute provides that a perpetrator is guilty of armed robbery if he or she "uses force or violence against any person who is present, *or who assaults or puts the person in fear*," while committing larceny. MCL 750.530(1) (emphasis added). The record provides sufficient evidence to prove beyond a reasonable doubt that defendant put Utterback in fear in the course of taking her cell phone. Utterback heard gunshots, which caused her to hide in the back room with her co-worker for approximately 30 minutes while defendant roamed around the store breaking merchandise, yelling, sobbing, and blaming his girlfriend on the telephone. Upon discovering the locked back room door, he threatened to shoot down the door. Utterback

testified that she was terrified, and that when defendant told her to give him her phone, she did so because she believed he had a gun, which, in fact, he did. It can be reasonably inferred from this evidence that defendant placed Utterback in fear while taking her cell phone.

Defendant also argues that the prosecution did not demonstrate that he intended to permanently deprive Utterback of her cell phone. A defendant's intent may be inferred from the facts and circumstances, including the defendant's actions. *Cameron*, 291 Mich App at 615. However, because armed robbery is a specific intent crime, it was insufficient for the prosecution to prove only that defendant took the cell phone; rather, the prosecution was required to prove that defendant possessed the specific intent to permanently deprive Utterback of her phone. See *Smith*, 336 Mich App at 303-304, 308. As discussed, to prove larceny, the prosecution was required to prove that the defendant intended to retain the property without the intent to return it within a reasonable time. See *Harverson*, 291 Mich App at 178.

Here, Utterback testified that when defendant demanded her cell phone, he told her that he wanted to use it to call 911. In the recording of the 911 call, defendant can be heard saying to Utterback, "I won't ruin your cell phone . . . I just need to use it." He can be heard on the 911 recording stating, "I got a girl's cellphone, she gave me her cellphone, well she didn't give it to me but I took it, I just told her I wouldn't hurt it." Immediately after giving her cell phone to defendant, at approximately 7:30 p.m., Utterback left the store at defendant's direction. Defendant remained inside the store for approximately six more hours, talking alternately with Sottillie and with police until his surrender at 1:35 a.m. the next morning. At one point during defendant's negotiations with police, defendant asks Sergeant Richard Charon of the Ionia County Sherriff's Department to tell Utterback that he is sorry, that he will not harm the cell phone, and that he will leave the cell phone behind. Video from surveillance cameras shows defendant later surrendering to police while talking on Utterback's cell phone; defendant placed the cell phone on the ground, was handcuffed by police, and the cell phone was retrieved by police and returned to Utterback. The evidence thus indicates that defendant took the cell phone with the intent to use the cell phone for the short-term purpose of talking to police while in the gas station; there was no evidence presented that he planned to retain the phone beyond his negotiations with police.

Indeed, the reasonable inference suggested by the record is that defendant was aware that he could retain the cell phone only temporarily. From his conversations with police and Sottillie during the standoff with police, defendant made clear that he was aware that his options were either to kill himself, to surrender to police, or to attempt to flee from the police or charge the police, which would almost certainly result in him being killed. Any of those courses of action would facilitate the speedy return of the cell phone to Utterback. Only destroying the cell phone would have prevented the return of the cell phone to Utterback, and defendant assured both Utterback and police that he would not destroy the cell phone.

The prosecution argues that defendant never returned the cell phone to Utterback. Although a defendant's actions can be evidence of intent, the determinative question is not whether defendant returned the cell phone but rather whether he intended to deprive Utterback of the cell phone permanently, that is, beyond a reasonable time, when he took it. Here, defendant's statements and actions suggest the opposite intent. Because the evidence does not support the conclusion that defendant intended to deprive Utterback permanently of her cell phone, we conclude that even viewing the evidence in the light most favorable to the prosecution, the trial

court erred by finding that the essential elements of armed robbery were proven beyond a reasonable doubt.

## B. SENTENCING

In Docket No. 367187, defendant contends that the trial court imposed an unjustified departure sentence for his convictions for intentional discharge of a firearm in a building, felon-in-possession of a firearm and ammunition, and malicious destruction of a building. Defendant argues that the trial court improperly relied on the minimum sentencing guidelines range calculated for defendant's armed robbery conviction rather than the accurate guidelines range for each offense.

Although the sentencing guidelines are advisory, trial courts must still consider the guidelines when imposing a sentence. *People v Lockridge*, 498 Mich 358, 365, 391-392; 870 NW2d 502 (2015). A defendant is entitled to be sentenced based on accurate information and accurately scored sentencing guidelines. *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). Resentencing is appropriate when the defendant's sentence was based upon an inaccurate calculation of the sentencing guidelines range. *Id*. at 89-90. When considering a challenge to the scoring of sentencing guidelines, we review for clear error the trial court's factual findings, which must be supported by a preponderance of the evidence. *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017). We review de novo whether the trial court's factual findings support a particular score under the guidelines, which is a question of statutory interpretation. *Id*.

MCL 771.14(2)(e) provides, in pertinent part:

(e) For a person to be sentenced under the sentencing guidelines set forth in chapter XVII, [the PSIR shall include] all of the following:

* * *

(*ii*) . . . for *each crime having the highest crime class*, the sentence grid in part 6 of chapter XVII that contains the recommended minimum sentence range.

(*iii*) . . . the computation that determines the recommended minimum sentence range for the crime having the highest crime class. [Emphasis added.]

A trial court "is not required to independently score the guidelines for and sentence the defendant on each of his concurrent convictions" as long as the court properly scores and sentences the defendant "on the conviction with the highest crime classification." *People v Reynolds*, 508 Mich 388, 393; 975 NW2d 821 (2021). The guidelines do not need to be scored for the lower crime class convictions because "a shorter concurrent sentence for the lower-level offense would expire before the longer concurrent sentence for the higher-level offense." *Id*. at 395. Nonetheless, a defendant is entitled to be sentenced based on accurate information and accurately scored sentencing guidelines, *Francisco*, 474 Mich at 88, and a sentence based upon inaccurate information is invalid, *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997).

In this case, defendant pleaded guilty to intentional discharge of a firearm in a building, a Class D felony, felon in possession of a firearm, felon in possession of ammunition, and malicious destruction of a building, all Class E felonies. Defendant was then convicted of armed robbery, a Class A felony. At sentencing, the trial court grouped the convictions for armed robbery, malicious destruction of a building, felon-in-possession, and intentional discharge of a firearm in a building and called them "life offenses," although armed robbery is the only conviction out of the five that is punishable by imprisonment up to life. MCL 750.529. The trial court then sentenced defendant to 570 to 900 months for each of the five felonies, which was at the top of the guidelines for the armed robbery conviction, but a departure sentence for the other convictions. The trial court denied defendant's motion to correct his sentence.

Because we vacate defendant's conviction for armed robbery, it no longer is the highest-class felony among defendant's multiple convictions. We therefore remand for recalculation of the guidelines and for resentencing of defendant for his convictions of intentional discharge of a firearm in a building, felon in possession of a firearm and ammunition, and malicious destruction of a building, which the trial court based upon the sentencing guidelines scored for the armed robbery conviction.

In Docket No. 363403, we vacate defendant's convictions and sentences for armed robbery and felony-firearm related to the armed robbery charge. In Docket No. 367187, we vacate his sentences for his convictions for intentional discharge of a firearm in a building, felon in possession of a firearm, felon in possession of ammunition, and malicious destruction of a building, and remand for resentencing. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Philip P. Mariani